The court will now hear the case of Underwood v. Bank of America Corporation, numbers 19-1349 and 20-1087. Mr. Goldman, Ms. Goldman, Mr. Goldman, you may proceed. Good morning, your honors. May it please the court, I'm Mark Goldman representing Eric Underwood and my24erica.com and I'd like to reserve three minutes for rebuttal. In a public website branded with his Erica marks, Mr. Underwood provided a search engine service accessible to and enjoyed by consumers around the world as evidenced by multiple declarations from those users he submitted. When a user typed in Batman into the search engine, for example, you received information about Batman under a tab labeled Batman-Erica. Just as someone doing a Google search would receive information under a tab labeled Batman-Google. Yet the district court found that Mr. Underwood had no trademark rights because as a matter of law, this worldwide use did not constitute use in commerce. That's wrong. As this court made clear in Drexel and Bishop, use far less extensive than that is sufficient to confer trademark rights. Indeed, this court said what matters is use of the mark with an intent to adopt and there's no test of how extensive the use is or how significant the duration. The district court said it's different here because Mr. Underwood provided services for free just as, for example, Facebook or Twitter did when they started. That's a staggering conclusion. Under it, Facebook and Twitter would have had no trademark rights until, as the district court said, their marks became substantial, had a substantial impact on the consuming public. And of course, if in the interim, another company registered the marks, they would never have acquired trademark rights at all. That's not the law under the Lanham Act or any other federal statute with a use in commerce as a jurisdictional predicate. Whether a mark is used in commerce does not depend on whether it is widely recognized. And that's true whether or not there have been sales. Mr. Goldman, was the entire in commerce use of Erika through GoDaddy or did your plaintiff use other platforms to be in commerce, in your opinion, in your argument? GoDaddy was the host for the website. Everything that you claim was in commerce ran through GoDaddy. Well, there were a number of uses prior to 2015 and whether they constitute use in commerce, I don't think we need to get there. I think the website was through GoDaddy and I don't think there's any question on summary judgments that it was hosted. And we've got a conflict here with the other side's testimony of Kenna Willis saying, no, we've shown that GoDaddy did not host this until after Bank of America registered its remark. It just looks like, I mean, that ought to be a well, easily determined issue. Why is that still a conflict? Factually, I think that somebody could look at that and really answer that question. I think, you know, that's a question for the jury, but I agree as a factual matter, it's very easy. We submitted declarations from multiple users who used the platform in 2015. We submitted an expert report from Hokeman that goes through all the evidence in the record. And then they submitted an evaluator of the GoDaddy thing that says we've looked at the GoDaddy account. And in fact, you didn't register until after Bank of America got their mark. You had a revision in the services you were hiring through GoDaddy. Does that explain the discrepancy? Was one pre-revision of your service agreement and one post or what? I'm just mystified how you can both disagree about something that is so objective and determinable. I don't know how they disagree. They're citing records from GoDaddy. But as we said in our expert report, those only go back six months. And the person they're relying on from GoDaddy is a paralegal. We had somebody, we had an expert go back through the actual evidence as to what's on the web and for multiple reasons found that the website was up and running. And again, we have declarations from multiple users. I agree it's easily determinable, but it's certainly not easily determinable in their favor on summary judgment. Mr. Goldman, slightly different question. On showing a protectable interest for your infringement claims, what was the service associated with the marks? So once the website was up and running, he was providing a search engine service and a personal assistant service. The search engine service, there was a search bar. As I said at the beginning, if you typed in something into that search bar like Batman, you received information about Batman under a tab that was labeled Batman-Erica. Same way as when you do a Google search, you would receive information under a tab labeled Batman-Google. And the website specifically in the section about Erica says that Erica is a search engine service. All right, search engine. And what else did you say? Well, personal assistant in that it was doing more than that. So Erica also provided recommendations about movies and entertainment options. So it wasn't just that you could type in information, type in a search and get it yourself. Erica was also doing other things like providing recommendations to you. All right. So given that those are the services, how did you show that a substantial portion of the public associated the marks with those services? So we think that that is not a required showing. You do not have to show, I mean, as I said, Facebook or Twitter, when you first start a service, no one has identified the mark with it. This court made clear in Drexel and Bishop that all that's required is use of the mark and with an intent to adopt. Bishop, a 1998 decision involved sales of an average of 98 bottles of a product a year, nothing like worldwide accessibility and certainly no evidence that a substantial fraction of the public identified the mark with service. That is just not the test. So you're saying the test is actual use? The test is actual use with an intent to adopt. Did you actually argue in opposition to summary judgment, actual use? We absolutely did. Did you cite any actual use cases? Every single case we cited with the one exception was a Lanham Act actual use case. We said the use was trademarked use. We never used the term analogous use. We said it was use in commerce. That's appendix 427, which is the test under the Lanham Act. We said the test for a website was whether it was accessible to anyone with access to the correct. We can review that. Where did the district court discuss actual use in ruling on summary judgment? The district court simply said that when there are no sales, when there have not yet been sales, the test is analogous use. Then it started citing analogous use cases rather than actual use cases. I would point out that even under analogous use, there is no case that the district court or Bank of America cites on facts remotely like these with publicly accessible site worldwide and services provided that found that was insufficient to confer worldwide for use. Is it relevant to show worldwide use or are you limited to use in the United States? What we need to show is use in commerce. Worldwide use can certainly constitute use in commerce. We cited many users from the United States among those who use the service. The declarations we cite in our brief include both users in the United States and users worldwide. We cite a lot of cases specifically about websites. We cite these in our summary judgment motion as well. We cite the 11th Circuit's planetary motion case. We cite the Northern District of California's HALO management case. We cite the trademark management of examination procedures, which is the procedure for registration under the Lanham Act and sets forth what is required to show use. All of them say that when the site is accessible to the public and includes the mark in a service, that is sufficient to create trademark rights. I just want to make sure that I just want to go back on something we've already said, but it's really pretty decisive for me. The difference between actual use and analogous use. The district court did address actual use, but said that because there's not a showing of profit commercial activity, I'm not going to use it. But he did consider the actual use argument. Is that right? Yes. The district court said there is no use in commerce, which is the Lanham Act standard, but then said that the standard for addressing use in commerce when there are no sales is the analogous use standard. I'm concerned about your time, but then in the pleadings, you never used or either in the briefing or in the pleadings, did you ever use the word actual use? You argued analogous use. When we look at the pleadings, where are we going to find a generic reference to actual use as distinct from analogous use? So we use the term trademark use, which is actual use. The defendant says we didn't say that. Not really, because trademark use could include analogous use. I mean, so that doesn't really work. We said it was use in commerce explicitly, which is the Lanham Act standard. That's appendix 427. Every single case we cited was except one was an actual use case. And this was never an issue in any case. There's no reason we would specifically distinguish between analogous use and actual use because we were bringing a Lanham Act claim and all of our arguments were Lanham Act arguments. And the very first line of our brief says the linchpin of the summary judgment motion is the claim that the my24erica.com website did not have content prior to June 2018, did not have actual use. I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. Mr. Bernstein. Thank you, Judge Matheson. I'm David Bernstein for Bank of America. May it please the court. There are three reasons why no reasonable jury could conclude that plaintiffs own any trademark rights in Erica, and I hope to be able to touch on them all three today. Very briefly, the first is that the Georgia registration, which Mr. Goldman has not even tried to defend, is unquestionably invalid. The second is that the sporadic limited sharing of Mr. Underwood's idea for a personal assistant avatar cannot meet the standard for analogous use. And then the third reason is the one that the panel has been speaking with Mr. Goldman about, which is that the movie database website that Mr. Underwood has doesn't create any trademark rights in Erica, and I'll explain that in some detail. Let me start very briefly with the first appeal. I think it doesn't need much time. Judge Moore. Could I interrupt you very quickly? I just want to clarify a few points. You had six counterclaims, and of course you got the partial summary judgment on the first counterclaim, and then you move for summary judgment on the plaintiff's claims, and you got summary judgment. But what happened to your remaining counterclaims, the five remaining counterclaims? They're essentially moot in light of the summary judgment ruling, Your Honor. But the summary judgment ruling didn't say anything about them. That's correct, Your Honor. The summary judgment didn't directly address those counterclaims, but counterclaims of non-infringement, for example, are effectively moot if the plaintiff has no trademark rights. If the plaintiff has no trademark rights, there's no question about infringement. Yeah, I understand that. I just wondered if we might need something to clean that up in the record. I know you've got your other agenda, but I'm concerned. What is your position about whether use in a website address is use in commerce at all? Your Honor, that's a great question. It's one the Supreme Court actually addressed just last year in a case that we were actually counsel on, and Mr. Goldman cited it in his papers, and that was the Booking.com case. What the Supreme Court said in Booking.com is that a domain name is an address. It's like a phone number. It's like your physical address. It just tells you where to go. Now, a phone number can become a trademark. 1-800-MATTRESS, we all know, is actually a company that sells mattresses. 1-800-FLOWERS is a particular company that sells flowers. It's not merely a trademark. But in order for a domain name or a URL, a Unified Record Locator, to achieve trademark rights, the Supreme Court told us in with a company. They don't associate just as an address, but actually they associate it. The evidence in the Booking.com case, which is discussed in Justice Ginsburg's decision, is exactly what is missing here. There was evidence that Booking.com brands their website with the Booking.com trademark. When they did a survey of consumers, more than 75% of consumers knew that Booking.com was a company offering those services. The association by the public with your product is a requirement generally under analogous use, not actual use. But you are saying that the Supreme Court in Booking.com said that even under an actual use claim, if the use is in your trade name, you still have to show a public association to a certain level. I don't know what level of saturation it would require, but some public level of association of your product with the name. Is that your position? So I think there's two different parts to that, Judge Eagle. First, if you have a name like Erica, which is a person's name, it automatically starts as being descriptive. It only acquires secondary... And in fact, it not only starts that way, but the plaintiff himself said E-R-I-C-A stands for, and then he gave a descriptive search term. That's correct, Your Honor. And indeed, there's also an action the plaintiff filed against us in the Trademark Trial and Appeal Board. And in his cancellation petition, count two of his cancellation petition, which this court could judicial notice of, because it's a public filing in the Trademark Trial and Appeal Board, says Erica is descriptive. And he concedes that in his TTAB filing against us. So I think there's two points there to your question, Judge Eagle. The first is if you have a descriptive term, and Booking.com is descriptive too. It's descriptive of a website at which you can book travel and other events. Well, but Erica is not descriptive. Erica, as a function word, is fanciful. It's not descriptive. So actually, the plaintiff says that Erica, the name, the acronym Erica is named after his sister in honor to his twin sister. When you have a name, you know, I'll say Kraft was a person's name. Chrysler was a person's name. Those don't become trademarks just when you use them in commerce. A person's name only becomes a trademark when you show that people associate it not with just a person, not just with your name, but with goods or services being sold. Kraft, of course, today, its secondary meaning actually has become its primary meaning of a brand. If I had my own website, and I said, here are David's movie picks, that wouldn't give me trademark rights in the term David. That would just show to people I'm communicating me, David. These are my movie picks. And what I'd encourage the panel to look at is the actual use that Mr. Goldman talked about on the website. Because this movie database website, first of all, let's be clear about what it is. Mr. Underwood went out and purchased the right to take someone else's movie database and put it on his website. So this is a third party's movie database that he's just thrown up on the internet. And he's added his name, Erica's movie picks to it. But all that tells you is somebody named Erica is saying, hey, here are my movie picks. I think one of the key reasons and that there's no trademark rights is that there's no association between the services, you know, Judge Matheson, you said, what are the services, information about movies, there's no linkage between the services that are offered on this website, even today, and the Erica trademark. So for example, there is there is because these are reported as Erica's pics. I mean, that's a to me, that's a very clear connection. So when you if you look at the, if you look at the complaint, Your Honor, and let me just get the site up here, you'll see that in the complaint at pages 30 and 31 of the appendix, and to avoid confusion, I'll refer to appendix page numbers only in the second case, you'll see images of his website that he's claiming trademark rights. He's got the my 24 Erica.com domain name. But again, domain names aren't trademarks until there's some association between the trademark and the services. So a domain name itself gives you no trademark rights. Then he's got a picture of this so called avatar. There's a lot of discussion in the record about how this isn't an animation. That's nonsense. This is just a cartoon. And he has a PowerPoint slide, which he showed in court, where the avatar has a little bubble that comes out of her mouth and words type in it, and it spins around on the screen. I mean, if that's an animation in PowerPoint, maybe it is, but don't be deceived into thinking this avatar is animated and ever speaks to you. It does not. He's got a picture of this cartoon. And then there's a search bar where you can search for movies. It's not at all like Google, as Mr. Goldman just described. When you go to the Google website, it is prominently branded Google right there. And then you've got the search engine. There is no branding of Erica there. You wouldn't know that you are at a movie database that has the brand Erica. Mr. Goldman started his argument that said a public website branded with his Erica marks. If whether you're using the name in your domain name, even if you're asserting an actual mark claim rather than analogous, if that has to have secondary meaning, how broad does your evidence have to be of a secondary meaning? Could eight or 10 people who said, yes, I use the site and I associated it in a secondary way, is that enough? Or do you need some expert to say we've looked at the market and there's 10,000 that believe this? What's the test for breadth on that? So there are, there are factors for secondary meaning, Your Honor, and courts look at the extent of sales, the extent of advertising, of brand awareness studies. Generally, if you do a survey, you're looking for 35% or more of the, of the public, the relevant public associating the mark to create secondary meaning. And I think, you know, that goes to one of the questions that, that is key here. And, and that is, well, what does it mean that you just threw a website up on the internet? It cannot be the law that by simply throwing a website up on the internet, you automatically are using that quote in commerce. And I think the, but they have more than that. They have been maybe eight or nine people who've we, we use that website and we, we access Erica's services. I would encourage you, Your Honor, to look very, very carefully at those declarations, because that's not what they say. The declarations are very craftily characterized and what they say, and, and these declarations are in the record at appendix 1092 through about 1102. And they say like, I visited my24erica.com, but they don't say what I saw on it. The vast majority of these declarations have absolutely no distinct description of all of saying, this is actually what I saw. You could have gone to it. There's no doubt that Mr. Underwood registered the domain name, my24erica.com, you know, back in the early 2012 period. I'm forgetting the exact date, but until you, until you host content at the website, there's nothing there. So it certainly is possible that these people in 2015 or 2016 went to my24erica.com and there was nothing there. And what they don't tell you in those declarations is I saw a movie database and, and I saw it was branded with the Erica trademark. That is missing in these You'll see that they just don't support the notion. Now, Mr. Goldman cited the trademark manual of examining procedure, the TMEP. And the TMEP is the manual that the trademark office uses to decide, you know, can you register this trademark? The trademark office's views are really important here. If you look at the case, we cited E. Inray DSM, which is at 87 USPQ, 2nd, 1623. The trademark office rejects the fact that just because you put your name, the cardio group on a website that automatically gives you trademark rights. And the reason is that the trademark office said there was no linkage in the use of the cardio group name on the website to the services they were providing. And we would submit it to the same here. There is no linkage to the movie database that Mr. Underwood has gotten from someone else to the Erica brand. It's not enough, as Mr. Goldman says, to have in in the bottom of the page, a statement that says Erica is my trademark. You don't get trademark rights by asserting this is my trademark. You get trademark rights by actually using it in commerce. There was another trademark office case Inray May, which we also cited in our papers, where a woman used the name and a and a cartoon avatar and said, this is my trademark. And she even had Sealy TM to to communicate on claiming trademark rights. And the trademark office said it's not functioning as a trademark. You're not showing that people associate this name. It's just a descriptive name with services. So, you know, I think the the declarations really don't support the notion that there was use. Now, you know, Judge Ebel, I mean, you raised another question, which I think is is the conclusive one here. And it's one that we did brief extensively below. And that is that GoDaddy has told us this website was not hosted. And the way it works is that you have a domain name, but it just sits out there. And I think we all learned a lot about servers from from Secretary Clinton. But you have to have a server that actually hosts your website. And GoDaddy serves as the host for Mr. Underwood's website. There is no doubt about that. And Mr. Underwood has another business called My 24 Hour News dot com. And that website was hosted at GoDaddy for many years. It was not until June 2018 that Mr. Underwood paid for the right to host a second website. And Miss Willis, who, Judge Ebel, you asked about. And by the way, she's not a mere paralegal. She's the director of global subpoena compliance for GoDaddy. Miss Willis went through all of the records. She established conclusively that there was no hosting of a second website. Mr. Underwood came up with a new theory that said, well, you know, it was actually hosted as a subdomain. Miss Willis testified about that in her deposition and said, no, this hosting package that Mr. Underwood purchased didn't allow for subhosting. Mr. Bernstein, does this court need to resolve this question to dispose of this appeal? You do not, Your Honor. And so I think the three questions you need to resolve are, is the Georgia registration valid? Yes, it is, because he never used the trademark before he applied for it. It was void after an issue. The second question is, was his sporadic promotion, sending out business plans, sending out DVDs of his so-called animation, telling people about his ideas, was that analogous use? I think Judge Moore has conclusively shown why it's not. And then the third thing is, did he have use in commerce? Not actual use, not did I actually post a website, but did I have something that qualifies as use in commerce? And because there was no linkage of the name Erica, the brand Erica, to anything on that website, the answer is no, as a matter of law. I see my time is up. I'd be happy to answer any further questions that the panel may have. Thank you, counsel. Mr. Goldman, you have rebuttal time. Yes. So first, starting with the declaration, I'd like to give a few examples. Appendix 1093, the Howard Declaration, says My24erica is a free service that, among other things, is a search engine. I personally think My24erica.com is a cool and useful platform to use. On page 18 of our brief, we quote the Kane Declaration, which says that My24erica.com, among other things, is a search engine which has news articles, movie, tea information, TV information, content suggestions from Erica, and actor information pages. We quote the Comte Declaration, which is Appendix 1097, which also talks about the same thing. We cite the Alston Testimony, which is in Appendix Volume 3, 482, explaining that he visited the website and had an understanding of how Erica worked as a search engine. Mr. Bernstein says the views of the And we cited the TMEP in opposing summary judgment. And Mr. Bernstein's wrong that throwing it up is insufficient. What the TMEP says specifically, that for a beta test website, even though it's offering a preliminary version of the service, if it's accessible to the public, that constitutes use in commerce. The case he cites, InReDSM, is different. That was a case from a Canadian company that did not offer services to anyone in the U.S. at all. The cases about websites specifically, like Planetary Motion, that we cite from the 11th Circuit, and HALA Management, show it's sufficient. Mr. Bernstein raises an entirely new issue about there being a descriptive mark, which he never argued below, did not argument his briefs here, and is wrong given the ways Erica is used, and the fact that it's used in a domain name, and there's a picture, and so forth. And finally, I see my time is up. Why don't you finish your thought? The related issue of association. Again, the declarations show the association as a matter of fact. The fact that when you type into the search engine, you get a result that says Batman-Erica, and the fact that the website explicitly says Erica is a search engine, certainly establishes, at a minimum, a fact question of association. Association is a fact question, certainly can't be decided on summary judgment. Thank you, counsel. The case will be submitted. We appreciate the arguments from both counsel this morning, and counsel are excused.